# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYSA ALCANTARA, | : | No. 1:16-CV-2353 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| AEROTEK, INC., | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM OPINION

## JUNE 15, 2018

Plaintiff Raysa Alcantara ("Plaintiff") filed a complaint against Defendant Aerotek, Inc. ("Defendant" or "Aerotek") alleging she was illegally denied a promotion and then fired from her job on the bases of national origin and race.[1] Plaintiff raised two claims under Title VII, 42 U.S.C. § 2000e-2(a)(1), and one claim under 42 U.S.C. § 1981.[2] Defendant has moved for summary judgment.[3] For the reasons that follow, Defendant's motion will be granted.

---

[1]  Compl. (ECF No. 1).

[2]  *Id.*

[3]  ECF No. 27.

# I. BACKGROUND[4]

Defendant is a recruiting company that provides temporary staffing to clients in a variety of industries, including the technical, professional and industrial fields.[5] Aerotek's principal place of business is located in Hanover, Maryland, but it has offices nationwide.[6] Plaintiff is a Hispanic female who was born in the Dominican Republic and who came to the United States in 2003.[7]

Plaintiff was hired as an Administrative Assistant at Aerotek's Lebanon, Pennsylvania, office in January 2014.[8] Aerotek has an "Employee Conduct and Work Rules" policy, which contains a non-exclusive list of examples of inappropriate conduct that may result in disciplinary action, up to and including immediate termination of employment. The list specifically identifies "disclosing business secrets or confidential information."[9] Plaintiff signed an Employee

---

[4] The relevant facts are taken from Defendant's Statement of Material Facts, (ECF No. 29); Plaintiff's Response to Defendant's Statement of Material Facts, (ECF No. 32), her additional statement of facts (*id.*), Defendant's Reply to Plaintiff's Response (ECF No. 35), and both parties' evidentiary exhibits, (ECF Nos. 30-1 through 30-7; ECF Nos. 32-2 through 32-8, and No. 36). If only one party's statement of material facts or response thereto is cited, it is because the relevant facts have been admitted by the opposing party. Any facts that remain in dispute are noted as such. I will sometimes borrow the parties' language without attribution but will also use quotation marks at times to clearly indicate when a party is being directly quoted. At times, Defendant asserts that some of Plaintiff's responses to its Statement of Material Facts do not contradict the statements and therefore its statements must be deemed admitted under Local Rule 56.1. I disagree. Local Rule 56.1 only requires that the nonmoving party "respond[ ]" to the statements, not contradict them.

[5] Defendant's Statement of Material Facts ("Def.'s SMF") ¶ 1.

[6] *Id.* ¶ 2.

[7] Pl.'s Resp. to Def.'s SMF ("Pl.'s Resp.") ¶ 3; Pl.'s Dep. (ECF No. 32-2) at 10, 16.

[8] Def.'s SMF ¶ 6.

[9] *Id.* ¶ 4.

Acknowledgment Form on January 13, 2014, indicating that she had received Aerotek's Employee Handbook and understood that it was her responsibility to read and comply with the policies contained in the handbook and any revisions made to it.[10]

As an Administrative Assistant, Plaintiff was part of the Field Support Group ("FSG"). At the time, the FSG at the Lebanon office included both an Administrative Assistant and a Customer Support Associate ("CSA").[11] Courtney Black Davila ("Davila") was the CSA in the Lebanon office at the time Plaintiff was hired until Davila was promoted to a larger Aerotek office in Reading, Pennsylvania in 2015, leaving the CSA position in Lebanon vacant.[12] Both Plaintiff, as the Administrative Assistant of the Lebanon office, and Davila, as the CSA of the Lebanon office, reported to a Customer Support Supervisor ("CSS").[13] Christina Auker ("Auker") was not the CSS for the Lebanon office when Plaintiff was hired, but later became CSS in charge of the Lebanon office's FSG.[14]

Administrative Assistants are responsible for ensuring Aerotek's customers, including contract employees, client managers, and local sales teams, receive

---

[10] *Id.* ¶ 5.

[11] *Id.* ¶ 7.

[12] *Id.* ¶ 8.

[13] *Id.* ¶ 9.

[14] *Id.* ¶ 10.

superior customer service and administrative support.[15]  In addition to other administrative tasks, the essential functions of Plaintiff's job as an Administrative Assistant included entering and managing background processes, communicating the results to the office, and assisting with office audits and compliance requirements.[16]  CSAs are responsible for ensuring that customers, contract employees, and local sales teams receive superior human resources, payroll, and benefits support.[17]  CSAs are also the primary liaison with the corporate office regarding all accounting related issues.[18]

### A.  Plaintiff Applies for the CSA Job and Has a Working Interview

After Davila transferred to the Reading, Pennsylvania office in 2015, Plaintiff applied for the open CSA position at the Lebanon office.[19]  On June 29, 2015, Plaintiff interviewed with Auker and Michael Dougherty ("Dougherty"), who was the Director of Business Operations for the Lebanon office.[20]  According to Defendant, Plaintiff performed poorly in the interview, as she was not fully prepared and did not appear to take the interview seriously.[21]  Plaintiff also struggled during the interview to detail the responsibilities of the CSA role, despite

---

[15]  *Id.* ¶ 11.

[16]  *Id.* ¶ 12.

[17]  *Id.* ¶ 13.

[18]  *Id.*

[19]  *Id.* ¶ 14.

[20]  *Id.* ¶ 15.

[21]  *Id.* ¶ 16; Auker Decl. (ECF No. 30-1) ¶ 15; Dougherty Dep. (ECF No. 30-6) at 29.

having worked closely with the previous CSA, Davila, for over a year and a half; she also declined to ask any questions about the position or its duties.[22]

Plaintiff disagrees with this assessment of the interview, saying she "honestly think[s ] [she] interviewed well,"[23] and she denies struggling to detail the responsibilities of the CSA role.[24] With respect to asking questions about the position or its duties, Plaintiff says she was well aware of what the position was about, having worked closely with Davila and having covered for her from time to time over the preceding year and a half.[25]

Defendant maintains that, although Plaintiff's "formal" interview was not successful, Auker decided to allow Plaintiff the opportunity to complete a "working interview" rather than simply deny her the job.[26] Plaintiff only admits that she was given a working interview.[27] During the period [of] her working interview, Plaintiff was the only candidate being considered for the position.[28] The working interview allowed Plaintiff a chance to prove that she could handle the

---

[22]   *Id.* ¶ 17; Auker Decl. (ECF No. 30-1) ¶ 16; Auker Dep. (ECF No. 30-5) at 51; Dougherty Dep. (ECF No. 30-6) at 29.

[23]   Pl.'s Resp. ¶ 16; Pl.'s Dep. (ECF No. 32-2) at 46.

[24]   *Id.* ¶ 17.

[25]   *Id.* ¶ 17; Pl.'s Dep. (ECF No. 32-2) at 45-47.  Plaintiff averred at her deposition, in response to an inquiry whether she had asked any questions at the interview, that she "kind of already knew what the position was about."  Pl.'s Dep. (ECF No. 32-2) at 47.

[26]   Def.'s SMF ¶ 18; Auker Decl. (ECF No. 30-1) ¶ 18; Auker Dep. (ECF No. 30-5) at 53-54.

[27]    Pl.'s Resp. ¶ 18 (admitting only that Plaintiff was given a working interview for the CSA position but citing no evidence).

[28]   Def.'s SMF ¶ 19.

duties of the CSA role; the working interview ran from approximately July 16, 2015, to August 7, 2015.[29]  On June 30, 2015, Auker provided Plaintiff with detailed instruction about the content and expectations of the working interview.[30]

On June 30, 2015, Auker sent Plaintiff an e-mail about the working interview.  In pertinent part, Auker stated: "I want to be clear this working interview period is a time for you to prove to the team you can handle the duties of the CSA role.  Come August 7th, there is no guarantee you will be promoted.  If we don't feel you are the right fit, the position will be posted."[31]  Plaintiff denies that Auker did not give her a guarantee that she would get the job; she says Auker told her she would get the CSA job following the working interview.[32]

During the working interview, Plaintiff performed the duties of the CSA position while still performing her administrative assistant duties.[33]  Auker reviewed the account volume of the Lebanon office and determined that it was reasonable for Plaintiff to perform the duties of both roles during her working interview.[34]  Plaintiff admits only that Auker believed it was reasonable that

---

[29]  *Id.* ¶ 26.

[30]  *Id.* ¶ 27.

[31]  Id. ¶28; Pl.'s Dep. (ECF No. 30-2) Ex. 6 at ECF p. 61.

[32]  Pl.'s Resp. ¶ 28.  In making this assertion, Plaintiff relies on her deposition testimony that she "believe[d]" she was guaranteed the position if she completed the working interview (ECF No. 32-2 at 48-49) and that Plaintiff spoke to Auker before the e-mail was sent and that is when Auker "kind of told [Plaintiff] that she was going to get the job if [Plaintiff] put it through."  *Id.* at 52.

[33]  Def.'s SMF ¶ 20.

[34]  *Id.* ¶ 21.

Plaintiff could perform both roles,[35] but adds that both Davila and Desiree Zeller (who would, as will be shown below, get the CSA job after it was decided that it would not be offered to Plaintiff) worked overtime while doing the Administrative Assistant and CSA jobs,[36] and Plaintiff was not allowed overtime hours during her working interview.[37] Defendant denies that she was not allowed overtime hours and states that Auker gave her any overtime she requested during the working interview.[38]

Davila had previously successfully fulfilled the duties of Administrative Assistant and CSA in Lebanon for approximately ten months.[39] Plaintiff responds that Davila worked at least five hours of overtime a week while she was performing both jobs[40] and that Zeller was allowed to work three to eight hours of overtime a week while she performed both jobs.[41] In contrast, as noted above,

---

[35] Pl.'s Resp. ¶ 21.

[36] *Id.*; Davila Dep. (ECF No. 32-3) at 17-18; Pl.'s Dep. (ECF No. 32-2) at 80-81; Def.'s Reply (ECF No. 35) to Pl.'s Resp. ¶ 21.

[37] Pl.'s Resp. ¶ 21; Pl.'s Dep. (ECF No. 32-2) at 80-81.

[38] Def.'s Reply (ECF No. 35) to Pl.'s Resp. ¶ 21; Auker Dep. (ECF No. 36) at 58.

[39] Def.'s SMF ¶ 22. Plaintiff denies this averment because she claims the cited portion of Davila's deposition does not support the averment that Davila did both jobs successfully. I disagree. A fair reading of the deposition does support the position that Davila did both jobs successfully. Davila Dep. (ECF No. 30-4) at 15-17 (Davila "was able to perform both of the roles at the same time" without "any significant strain or difficulty").

[40] Pl.'s Resp. ¶ 22; Davila Dep. (ECF No. 32-3) at 17-18. The court adds that Davila also testified that she needed the overtime to perform both jobs. Davila Dep. (ECF No. 32-3) at 17.

[41] *Id.* ¶ 22; Pl.'s Dep. (ECF No. 32-2) at 80-81; Zeller Dep. (ECF No. 32-4) at 17-18.

Plaintiff was denied any overtime during the working interview.[42]  As also noted above, Defendant denies she was not allowed overtime.[43]

Working interviews are not standard practice at Aerotek, and Auker had no obligation to offer the trial period to Plaintiff.[44]  In fact, this was the first working interview Auker had offered since being a CSS, and Auker has not offered any current or potential employee a working interview since Plaintiff.[45]

Plaintiff completed training modules during her working interview, worked with Davila, and had weekly meetings with Auker to learn the duties of the position.[46]  However, Davila admitted that because of her own workload, she was not able to train Plaintiff the way she needed to, and Davila told Auker she did not have time to train Plaintiff.[47]  Additionally, according to Plaintiff, when Auker advised Plaintiff that Plaintiff would not get the CSA role after the working interview, Auker admitted to Plaintiff that Auker was not there for her.[48]  For

---

[42]  *Id.* ¶ 21; Pl.'s Dep. (ECF No. 32-2) at 80-81.

[43]  Def.'s Reply (ECF No. 35) to Pl.'s Resp. ¶ 21; Auker Dep. (ECF No. 36) at 58.

[44]  Def.'s SMF ¶ 23.  Plaintiff only admits that working interviews are not standard practice at Aerotek but denies that Auker was not obligated to offer Plaintiff the working interview because she asserts this is a conclusion of law.  I do not view this statement as a conclusion of law and believe it is fairly based on the evidence that Plaintiff does admit that working interviews are not standard practice at Aerotek.  If working interviews are not standard practice, there can be no obligation to offer them.  There is also the evidence presented immediately below that Plaintiff is the only person ever offered a working interview.

[45]  *Id.* ¶ 24.

[46]  *Id.* ¶ 25; Auker Decl. (ECF No. 30-1) ¶ 24; Auker Dep. (ECF No. 30-5) at 56-57.

[47]  Pl.'s Resp. ¶ 25; Davila Dep. (ECF No. 32-3) at 36-37.

[48]  *Id.*; Pl.'s Dep. (ECF No. 32-2) at 83-84.

someone who is a new hire at Aerotek for the CSA position, there is formal training in the form of modules that the new hire completes to learn the role.[49]  In contrast, Plaintiff did not complete those modules prior to her working interview.[50]

Defendant asserts that throughout the working interview, Plaintiff struggled with time management, task prioritization, attention to detail, and procedure compliance.[51]  In response, Plaintiff states she "completed the working interview very well."[52]  Additionally, Defendant contends Plaintiff failed to address issues that were raised at her weekly meetings with Auker.[53]  Plaintiff again responds, with the same supporting evidence, that she "completed the working interview very well."[54]

Auker reached out to Plaintiff on a daily basis to see if she needed any help or support; generally, Plaintiff would not respond to Auker's inquiries.[55]  Plaintiff does not directly deny this statement but asserts that Auker "was not there for

---

[49]   Pl.'s Additional Undisputed and Material Facts ("Pl.'s Add. SMF") ¶ 80.

[50]   *Id.*

[51]    Def.'s SMF ¶ 29; Auker Decl. (ECF No. 30-1) ¶ 26 ("Throughout the working interview. Alcantara struggled with time management, task prioritization, attention to detail, and procedure compliance.") .

[52]    Pl.'s Resp. ¶ 29.  As support for this statement, Plaintiff cites her deposition testimony that she "honestly think[s] [she] did great during the working interview . . . I feel like I was given the working interview with the CSA role along with my job.  They kind of consolidated everything, and they just kind of gave everything to me at once."  ECF No. 32-2 at 59.

[53]   Def.'s SMF ¶ 30; Auker Dep. (ECF No. 30-5) at 59.

[54]   Pl.'s Resp. ¶ 30.

[55]   Def.'s SMF ¶ 32; Auker Dep. (ECF No. 30-5) at 61.

Plaintiff when she needed help."[56] Both Auker and Davila were available to

Plaintiff as resources if she needed help, and Plaintiff admitted that both Auker and

Davila did provide her with help when she sought assistance from them.[57] Plaintiff

does not directly contest this statement but avers that, as noted above, Davila

admitted that because of her own workload, she did not train Plaintiff the way she

needed to be trained.[58] She also avers, as noted above, that Auker admitted to

Plaintiff that Auker was not there for her.[59] During the working interview, Plaintiff

never expressed to Auker that she felt that she was not getting enough support or

training or that she felt overwhelmed by having the duties of the Administrative

Assistant position and the CSA position at the same time.[60]

## B. E-Mails During the Working Interview

During the working interview, Auker sent certain e-mails identifying errors

in Plaintiff's work as CSA. In a July 29, 2015 e-mail Auker sent Plaintiff, Auker

---

[56]  Pl.'s Resp. ¶ 32.  As support for this statement, Plaintiff cites her deposition testimony that she "reached out at to Auker for help during the working interview," "would actually connect with her on the phone," but that Auker "was not there for her in the sense that there was no one-on-one away from the front desk . . . to learn the process of the CSA role."  ECF No. 32-2 at 59-60.

[57]  Def.'s SMF ¶ 33; Pl's Dep. (ECF No. 30-2) at 61 (Plaintiff did not ask for any specific resources that Auker failed to provide her, and Davila helped her when Plaintiff sought help from her).

[58]  Pl.'s Resp. ¶ 33; Davila Dep. (ECF No. 32-3) at 36-37.

[59]  *Id.* Defendant objects (Def.'s Reply ECF No. 35 ¶ 33) that Plaintiff's response relies on hearsay.  I disagree.  As to Davila, Plaintiff relies on Davila's deposition.  As to Auker, Plaintiff does rely on her own testimony, but it does not appear to be hearsay under Fed. R. Evid. 801(d)(2).  In any event, Defendant provides no legal support for its hearsay argument.

[60]  Def.'s SMF ¶ 34.

identified several missing and inaccurate contractor[61] folders.[62]  Plaintiff admitted

these were all folders she was responsible for sending in.[63]  She does not recall

responding to the e-mail or whether the e-mail was accurate in describing certain

folders as missing and others as inaccurate.[64]

Defendant also submits a series of e-mails to support its criticism that

Plaintiff was untimely, all sent on Friday, July 31, 2015.  Plaintiff sent an e-mail,

copied to Auker, asking two  Aerotek corporate employees if they needed her to do

anything.[65]  Auker responded to this e-mail as follows:  "I told you on Monday to

complete an info path form with the KIQ attached.  I believe Courtney [Davila]

told you the same information.  Were the info path forms not submitted."[66]

Plaintiff responded that she had not submitted them but that she would "submit that

right now."[67]  Auker replied: "That is fine that you submit them now but however

now these 2 will count against the scorecard.  It is vital that you are aware of the

audit deadlines and the importance of hitting those deadlines."[68]  Plaintiff could not

---

[61]   "Contractor" or "candidate" are Aerotek's terms for an individual seeking temporary employment from Aerotek.

[62]   Def.'s SMF ¶ 35; Pl.'s Dep. (ECF No. 30-2) at 62-63 and Ex. 7 to Pl.'s deposition.

[63]   Pl.'s Dep. (ECF No. 30-2) at 62.

[64]   Pl.'s Dep. (ECF No. 30-2) at 62-63.

[65]   Def.'s SMF ¶ 35; Pl.'s Dep. (ECF No. 30-2) at 64-65 and Ex. 9 to Pl.'s deposition.

[66]   *Id.*  Pl.'s Dep. (ECF No. 30-2) at 65 and Ex. 9 to Pl.'s deposition.

[67]   *Id.*  Pl.'s Dep. (ECF No. 30-2) at 66 and Ex. 9 to Pl.'s deposition.

[68]   *Id.*  Pl.'s Dep. (ECF No. 30-2) at 66-67 and Ex. 9 to Pl.'s deposition.

recall if Auker told her on Monday to submit those forms but admitted that Auker was accurate that the untimely submissions would count against the scorecard.[69]

In an August 6, 2015 e-mail, Auker advised Plaintiff there were "3 missing SUTA burdens for the below contractors."[70] Plaintiff admitted this was her error.[71] In an August 10, 2015 e-mail Auker sent to Plaintiff, Auker said that "Lucas hours are incorrect" and asked her to correct an error in listing regular hours under overtime.[72] Plaintiff admitted this was "[p]robably" her mistake but said that "Lucas was also salary so."[73] In an August 17, 2015 e-mail Auker sent to Plaintiff, Auker pointed out an error Plaintiff had made in the "Pay Group Audit."[74] Plaintiff admitted this was her error and that it had to be corrected.[75]

Auker sent other e-mails to Plaintiff, which Defendant also represents as illustrating Plaintiff's inability to do the CSA job. In a July 30, 2015 (Thursday) e-mail, Auker said she was "[j]ust checking in" and asked how Plaintiff was "doing today." In the e-mail, Auker also asked Plaintiff what were "some of the things" Plaintiff had to have "completed" before Plaintiff left "at 5," adding that Auker saw that Plaintiff had "3 starts in the system," and asking if Plaintiff was "good" to

---

[69] *Id.* Pl.'s Dep. (ECF No. 30-2) at 66-67 and Ex. 9 to Pl.'s deposition.

[70] *Id.* Pl.'s Dep. (ECF No. 30-2) at 68 and Ex. 10 to Pl.'s deposition.

[71] *Id.*

[72] *Id.* Pl.'s Dep. (ECF No. 30-2) at 70 and Ex. 12 to Pl.'s deposition.

[73] *Id.* Pl.'s Dep. (ECF No. 30-2) at 70-71 and Ex. 12 to Pl.'s deposition.

[74] *Id.* Pl.'s Dep. (ECF No. 30-2) at 73-74 and Ex. 14 to Pl.'s deposition.

[75] *Id.*

have them "completed by tomorrow."[76] Plaintiff says she does not recall if she responded to this e-mail.[77]

In an August 6, 2015, e-mail, Auker said: "I located this on the Aeronet and thought it may be a good resource for you in regards to audit deadlines. Let me know if you have any questions."[78] Auker attached the "FSG Scorecard Audit Instructions."[79] Plaintiff had reviewed these instructions before and reviewed them after Auker had sent them. Plaintiff did not ask Auker any questions after she reviewed them, and she does not recall if she responded to the e-mail.[80]

In an August 12, 2015 e-mail, Auker apparently criticized Plaintiff for approving a worker's compensation list when it included a contractor from Reading, not Lebanon.[81] Plaintiff said it was not necessarily her mistake as she thought her response was limited to the Lebanon contractors.[82]

In an August 17, 2015 e-mail, Auker said: "For July we are projecting a 74.42 for the scorecard. We have some areas that we need to focus on Raysa we (sic) will sit down on Thursday when I am here."[83] Plaintiff cannot recall if Auker

---

[76] *Id.* Pl.'s Dep. (ECF No. 30-2) at 63 and Ex. 8 to Pl.'s deposition.

[77] Pl.'s Dep. (ECF No. 30-2) at 63.

[78] Def.'s SMF ¶ 35. Pl.'s Dep. (ECF No. 30-2) at 68-69 and Ex. 11 to Pl.'s deposition.

[79] *Id.*; Pl.'s Dep. (ECF No. 30-2) at 69 and Ex. 11 to Pl.'s deposition.

[80] Pl.'s Dep. (ECF No. 30-2) at 69.

[81] Def.'s SMF ¶ 35. Pl.'s Dep. (ECF No. 30-2) at 71 and Ex. 13 to Pl.'s deposition.

[82] Pl.'s Dep. (ECF No. 30-2) at 72-73.

[83] Def.'s SMF ¶ 35. Pl.'s Dep. (ECF No. 30-2) at 74 and Ex. 15 to Pl.'s deposition.

talked to her that week, said that the scorecard goal they were trying to achieve was 69, and did not know the areas that Auker said they needed to focus on.[84]

In an August 18, 2015 e-mail, Auker asked Plaintiff if she felt comfortable with Auker's explanations concerning some funds some of the contractors owed for 2015, a matter which Plaintiff as the CSA was responsible for, or if she needed Auker's help.[85] Plaintiff does not recall if she responded to Auker's e-mail, and in any event she did not need Auker's help on the matter.[86]

## C. Auker Decides Not to Promote Plaintiff to the CSA Job and Desiree Zeller Is Hired Instead

By the end of the working interview, according to Defendant, it was clear to Auker that Plaintiff was not a fit for the CSA position due to Plaintiff's "issues with time management, missed deadlines and inattention to detail."[87] Plaintiff "specifically denie[s] that Plaintiff was not fit for the CSA position or that her performance during the working interview was not satisfactory."[88] Plaintiff also avers that she "completed the working interview very well."[89] Plaintiff also points

---

[84] Pl.'s Dep. (ECF No. 30-2) at 75.

[85] Def.'s SMF ¶ 35. Pl.'s Dep. (ECF No. 30-2) at 76 and Ex. 16 to Pl.'s deposition.

[86] Pl.'s Dep. (ECF No. 30-2) at 76.

[87] Def.'s SMF ¶ 36. Auker Decl. (ECF No. 30-1) ¶ 27; Auker Dep. (ECF No. 30-5) at 62.

[88] Pl.'s Resp. ¶ 36.

[89] For this assertion, Plaintiff relies on her deposition testimony that she "honestly think[s] [she] did great during the working interview . . . I feel like I was given the working interview with the CSA role along with my job. They kind of consolidated everything, and they just kind of gave everything to me at once." ECF No. 32-2 at 59.

to Davila's testimony that if Plaintiff had been given "formal training," she would have been able to do the CSA job.[90]

Auker made the decision that Plaintiff would not get the promotion and notified Plaintiff in person that she would not be promoted to the CSA position.[91] Plaintiff understood that the position would be posted externally so that Aerotek could hire someone else to fill the position.[92] Plaintiff did not indicate that she believed that the denial of the promotion was discriminatory when Auker told her that she would not be given the CSA position or at any other time before her termination.[93]

Desiree Zeller ("Zeller"), a Caucasian female, was subsequently hired from outside of the organization to fill the CSA position and began working in September 2015.[94] Zeller majored in human development and family studies at Penn State, graduated in August 2012, and her jobs between her graduation from college and starting at Aerotek were two nanny jobs, a day care teacher job, and working in a sporting goods store on the weekends.[95]

Defendant maintains that "Zeller had the requisite management, attention to detail, and interpersonal skills and experience in customer service for the CSA

---

[90] Pl.'s Resp. ¶ 36; Davila Dep. (ECF No. 32-3) at 39.

[91] Def.'s SMF ¶ 37.

[92] *Id.* ¶ 38.

[93] *Id.* ¶ 39.

[94] *Id.* ¶ 40.

[95] Pl.'s Resp. ¶ 41.  Zeller Dep. (ECF No. 32-4) at 6-7.

position."[96] Plaintiff worked with Zeller for approximately a month before

Plaintiff's termination and stated that she did not witness Zeller make any errors

while they worked together.[97] Plaintiff asserts that Zeller was permitted to train for

the CSA position without having to do the Administrative Assistant job at the same

time.[98] Defendant counters that during Zeller's training Plaintiff held the

Administrative Assistant position, so there was no need for Zeller to do both jobs

at the same time.[99]

### D. Aerotek's Procedure for Conducting Background Checks

When an Aerotek client requires a background check of a candidate,

background checks are performed on a post-offer, pre-employment basis.[100]

Aerotek's FSG employees are responsible for obtaining authorization forms and

other information from the candidate prior to submitting the candidate's

information directly into a background check system operated by a third-party

vendor, Sterling Talent Solutions ("Sterling").[101] Once a background check is

---

[96] Def.'s SMF ¶ 41. Auker Decl. (ECF No. 30-1) ¶ 30 ("Zeller's resume and interview demonstrated that she had the requisite management, attention to detail, and interpersonal skills and experience in customer service for the CSA position.").

[97] Def.'s SMF ¶ 42.

[98] Pl.'s Add. SMF ¶ 79; Pl.'s Dep. (ECF No. 32-2) at 79.

[99] Def.'s Reply to Pl.'s Add. SMF ¶ 79. Defendant cites no evidence to support this statement, but it is apparent from other evidence in the record that it is true. As noted above, Zeller began working as the CSA in September 2015 and, as will be seen below, Plaintiff was discharged from the Administrative Assistant job in October 2015.

[100] Def.'s SMF ¶ 44.

[101] *Id.* ¶ 45.

completed, the FSG employee in a particular office and anyone else who had previously been provided a username and password for entry of data into the Sterling system will receive an e-mail notification from Sterling which includes a preliminary score.[102] FSG employees are not privy to the contents of the candidate's background check report, but only the preliminary score, which indicates that the candidate meets hiring criteria or that further review or an Individual Assessment is needed.[103]

After receiving the preliminary score, the FSG is responsible for contacting Aerotek's Background Investigation Department, which evaluates the candidate's background check report and determines a candidate's eligibility for a particular client.[104] The FSG is also required to provide Aerotek's Background Investigation Department with proof that the candidate's authorization was signed and a subject profile form completed by the candidate, so if further review, or an Individual Assessment is required, the Background Investigation Department has the candidate's contact information.[105]

An Individual Assessment is the process utilized by Aerotek's Background Investigation Department to make hiring decisions by obtaining additional,

---

[102] *Id.* ¶ 46.

[103] *Id.* ¶ 47.

[104] *Id.* ¶ 48.

[105] *Id.* ¶ 49.

relevant details from candidates with a reported criminal history.[106]  The Individual

Assessment takes into consideration factors such as rehabilitation for employment,

the candidate's description of the circumstances surrounding criminal convictions,

and other pertinent information, in accordance with Equal Employment

Opportunity Commission guidance.[107]

At the beginning of the Individual Assessment process, the background

analyst will verify the e-mail address and current address on the candidate's report

based on the subject profile form completed by the candidate.[108]  Aerotek's

Background Investigation Department notifies Sterling if an Individual Assessment

is required; Sterling then sends the Individual Assessment paperwork directly to

the candidate via the candidate's preferred method of communication, either e-mail

or overnight mail.[109]  The FSG is not part of this process at all, and only receives

standardized notifications in the form of status updates when a disposition is

changed in the report by Aerotek's Background Investigation team.[110]

After receiving the Individual Assessment request for information from

Sterling, the candidate is instructed to complete the documents and send them

---

[106]  *Id.* ¶ 50.

[107]  *Id.* ¶ 51.

[108]  *Id.* ¶ 52.

[109]  *Id.* ¶ 53.

[110]  *Id.* ¶ 54.

directly back to Sterling, and not to Aerotek, within 48 hours.[111]  The completed

Individual Assessment documents can be returned to Sterling by mail, fax, or e-

mail.[112]  If a candidate wishes to commence a dispute regarding information

gathered through the Individual Assessment process, he or she must contact

Sterling directly rather than going through Aerotek.[113]  When Sterling receives

completed Individual Assessment documentation from a candidate, it then date

stamps and e-mails a PDF version of the received information to Aerotek's

Background Investigation team.[114]

     Defendant represents that its policy requires a candidate/contractor to

respond directly to Sterling about individual assessments so that at no point are

FSG personnel, including Administrative Assistants or CSAs, involved in the

Individual Assessment process.[115]  Defendant represents that it would violate

Aerotek's policy if an FSG employee were to e-mail the completed Individual

Assessment documents to Sterling.[116]  Additionally, Defendant represents that FSG

---

[111]  *Id.* ¶ 55.

[112]  *Id.* ¶ 56.

[113]  *Id.* ¶ 57.

[114]  *Id.* ¶ 58.

[115]  *Id.* ¶ 59; Auker Decl. (ECF No. 30-1) ¶ 34 ("At no point are FSG personnel, including Administrative Assistants or CSAs, to be involved in the Individual Assessment process, as Aerotek's policy requires a candidate/contractor to respond directly to Aerotek's third-party background investigation company, Sterling . . ."); Karen L. DuCellier McClaren Dep. (ECF No. 30-3) at 23-24.  DuCellier McLaren ("DuCellier") is a compliance supervisor in Aerotek's Background Investigation Department.  *Id.* at 10.

[116]  *Id.* ¶ 63.  Auker Dep. (ECF No. 30-5) at 44 (e-mailing the documents would violate Aerotek policy).

personnel are not permitted to help a candidate complete the Individual Assessment paperwork.[117]  It is also a violation of Aerotek's policy for an FSG employee to keep a copy of completed Individual Assessment paperwork in any way, shape, or form.[118]  However, "if for some reason the candidate cannot" "respond directly to Sterling without assistance," "the Administrative Assistants and CSAs should have as little contact with the Individual Assessment process as possible."[119]

With the exception of the statement that FSG personnel are not to retain a copy of Individual Assessment paperwork, Plaintiff disputes these representations concerning Aerotek policy.  While acknowledging "there was a preference for FSGs to not get involved in the Individual Assessment process,[120] Plaintiff asserts "FSG personnel could help the candidate/contractor email or fax the Individual Assessment paperwork back.  FSG personnel could also verbally assist the candidate/contractor in filling out the paperwork."[121]

In making this assertion, Plaintiff relies on the Davila deposition.  Davila testified that in her experience as an administrative assistant or CSA, she would

---

[117]  *Id.* ¶ 64.  Auker Decl. (ECF No. 30-1) ¶ 37 ("Additionally, FSG personnel are not permitted to help a candidate complete the Individual Assessment paperwork.").

[118]  *Id.* ¶ 62.

[119]  *Id.* ¶ 60; DuCellier Dep. (ECF No. 30-3) at 29-30 (company policy is that the candidate should respond directly with the form to Sterling without assistance.  If the candidate for some reason cannot do that, "the admins and CSAs are told to have as little contact with that as possible.").

[120]  Pl.'s Resp. ¶ 61.  Davila Dep. (ECF No. 32-3) at 30-31.

[121]  *Id.* ¶ 59.  Davila Dep. (ECF No. 32-3) at 30-31.

help a contractor e-mail or fax an Individual Assessment when the contractor brought a completed individual assessment form into the office. She would also verbally assist the contractor in filling out the form but not physically fill it out herself. She would not proofread the form. She would send it in as is.[122] Davila testified that she was following this process before Plaintiff commenced her employment with Aerotek. No one ever told her it was wrong. She is still following the same process.[123] Before this lawsuit was filed, Auker was not aware that Davila had ever e-mailed Individual Assessment paperwork directly to Sterling in violation of Aerotek policy.[124]

### E.  Plaintiff's Alleged Violation of the Background Check Policy and Her Discharge

Aerotek claims that on October 22, 2015, Karen DuCellier, Aerotek's Compliance Supervisor in its Background Investigation Department, contacted Auker and stated that there was a security breach in a background check process in that Plaintiff did not follow Aerotek protocol with respect to a contractor's completed Individual Assessment form.[125] Plaintiff denies that DuCellier said that there had been a violation of Aerotek policy, only that DuCellier wanted Auker to look into the situation where Individual Assessment paperwork for a prior job

---

[122]  Davila Dep. (ECF No. 32-3) at 30-31.

[123]  Pl.'s Resp. ¶ 61. Davila Dep. (ECF No. 32-3) at 32-33.

[124]  Auker Decl. (ECF No. 36) ¶ 5.

[125]  Def.'s SMF ¶ 66; citing in part Auker Decl. (ECF No. 30-1) ¶ 32.

posting was being submitted for a subsequent job posting.[126]  No one suggested to

DuCellier any particular procedures that Plaintiff may have violated.[127]

Aerotek claims that Plaintiff violated company policy when by way of an e-mail dated October 16, 2015, she sent to Sterling a candidate's Individual Assessment paperwork prepared for a prior job posting for a subsequent job posting.[128]  (It also appeared that the date of the paperwork had been changed.)[129]  E-mailing the previously completed paperwork indicated to Auker that Plaintiff had saved the paperwork against Aerotek's policy.[130]  According to Auker, Plaintiff committed three violations of Aerotek policy: (1) she e-mailed Individual Assessment documents; (2) she saved paper copies of the documents; and (3) she assisted contractors in filling the documents out.[131]

Plaintiff denies that she violated Aerotek policy.  She did e-mail the same Individual Assessment paperwork twice, once on October 1, 2015, for the previous

---

[126]  Pl.'s Resp. ¶ 66, citing DuCellier Dep. (ECF No. 32-5) at 37-38.

[127]  *Id.*, citing DuCellier Dep. (ECF No. 32-5) at 40.

[128]  Def.'s SMF ¶ 67; Auker Decl. (ECF No. 30-1) ¶ 33 ("In violation of Aerotek's policy, Alcantara had forwarded old Individual Assessment paperwork that a candidate/contractor had previously completed for a prior job via e-mail directly to Sterling. (DuCellier Dep. 36:21-38:14; Alcantara Dep. Ex. 17"); Pl.'s Dep. (ECF No. 30-2) Ex. 17, ECF pp. 94-95.

[129]  *Id.* ¶ 67; DuCellier Dep. (ECF No. 30-3) at 38.

[130]  *Id.* ¶ 68; Auker Dep. (ECF No. 30-1 ) ¶ 40.  Further, Auker avers that Plaintiff in fact admitted she had saved the previous paperwork.  Auker Dep. (ECF No. 30-5) at 30.  This averment is contradicted by Plaintiff's deposition testimony that she had the paperwork because the candidate had brought the paperwork back the second time, not because Plaintiff had kept a copy of it.  Pl.'s Dep. (ECF No. 32-2) at 90.

[131]  Auker Dep. (ECF No. 30-5) at 44-45.

job and again on October 16, 2015.[132]  But she did not know that the paperwork was for different jobs, and the candidate, who brought the paperwork to her (so Plaintiff had not saved the paperwork), told her that Sterling had not received the paperwork sent on October 1.[133]  The candidate did not ask her any questions about completing the paperwork; she only asked her to forward it, and that is what Plaintiff did.[134]  In fact, that contractor had applied through Aerotek's office at Ingram Micro, so Plaintiff was not involved with that contractor at all other than forwarding the documents to Sterling.[135]  In short, Plaintiff followed the procedure Davila had taught her.[136]

Plaintiff also asserts that, while it is an exception to the policy, Administrative Assistants and CSAs were permitted to transmit Individual Assessment paperwork for candidates.  She relies on DuCellier's deposition testimony.  DuCellier stated that if a contractor brought in Individual Assessment paperwork and if she did not have the capacity to fax or e-mail the form, the company "policy is not to have any involvement.  They would be encouraged to transmit that form directly to Sterling via a Kinko's or a library, or something like

---

[132]  Pl.'s Resp. ¶ 67.

[133]  *Id.* ¶ 68; Pl.'s Dep. (ECF No. 32-2) at 90-91, 94-95.

[134]  *Id.*; Pl.'s Dep. (ECF No. 32-2) at 91-92.

[135]  *Id.*; Pl.'s Dep. (ECF No. 32-2) at 91.

[136]  *Id.* ¶ 65; Pl.'s Dep. (ECF No. 32-2) at 99.

that."[137]  If for some reason, however, those options are not available,  "the candidate can ask [the administrative assistant] or the CSAs to submit that on their behalf, but the admins and CSAs should not be reading it, should not be guiding the candidates in any way.  They should just be transmitting it and provide transmission forms to the candidate, so they can initially go through; and, again, only at the candidates request."[138]

Defendant states that Auker confronted Plaintiff about the expired paperwork being e-mailed to Sterling instead of the correct paperwork, and Plaintiff admitted doing this.[139]  Plaintiff admits she e-mailed the paperwork but asserts, relying on her position noted above, that she simply followed the process Davila had taught her.[140]  Defendant states that Plaintiff also admitted that she looked over the paperwork before e-mailing the completed forms to Sterling.[141]  Plaintiff denies this statement, again stating that she simply followed the process Davila had taught her.  Plaintiff also relies on the deposition testimony of Zeller, the current CSA at the Lebanon office.  Zeller testified that she faxes Individual Assessment paperwork and looks at the first page of the form, which has the

---

[137]  *Id.* ¶ 67; DuCellier Dep. (ECF No. 32-5) at 30.

[138]  *Id.*; DuCellier Dep. (ECF No. 32-5) at 30-31.

[139]  Def.'s SMF ¶ 69; Auker Decl. (ECF No. 30-1) ¶ 38; Auker Dep. (ECF No. 30-5) at 30.

[140]  Pl.'s Resp ¶ 69; Pl.'s Dep. (ECF No. 32-2) at 100-01.

[141]  Def.'s SMF ¶ 70; Auker Dep. (ECF No. 30-5) at 33 (Plaintiff told Auker about the first documents that the contractor was confused so she helped that individual fill out the paperwork); Pl.'s Dep. (ECF No. 30-2) at 98 ("look over the documents before I send [them] over.").

contractor's name, the date, the position they are applying for and the fax number.[142]

Auker consulted with Suzanne Russo, Human Resources Manager for the Northeast Region of Aerotek, who indicated that Plaintiff's violations of Aerotek's policy were grounds for termination.[143]  As a result, Plaintiff was discharged on approximately October 22, 2015.[144]  The Administrative Assistant position held by Plaintiff was not filled after Plaintiff's termination, as Zeller took over the Administrative Assistant duties in Aerotek's Lebanon office.[145]

Plaintiff claims that another Aerotek Administrative Assistant, Josei Martinez ("Martinez"), who is also Hispanic, informed Plaintiff that Martinez has e-mailed Individual Assessment paperwork to Sterling and was not fired; Martinez is not supervised by Auker and works on-site at an Aerotek client.[146]

Plaintiff also claims that two non-Hispanic employees, Brandyn Keller ("Keller") and Matthew Tischbein ("Tischbein"), improperly e-mailed contractor information to a client.[147]  Keller and Tischbein are not FSG employees, but are both Recruiters who report to Account Manager Matt Drye.  Plaintiff also admitted

---

[142]  Pl.'s Resp. ¶ 70; Zeller Dep. (ECF No. 32-4) at 22-23.

[143]  Def.'s SMF ¶ 71.  Plaintiff responds to this statement with Russo's deposition testimony that she never had any interaction with Plaintiff before her termination nor did she investigate Plaintiff.  Pl.'s Resp ¶ 71; Russo Dep. (ECF No. 32-6) at 14-15, 21.

[144]  *Id.* ¶ 72.

[145]  *Id.* ¶ 73.

[146]  *Id.* ¶ 74.

[147]  *Id.* ¶ 75

that she did not know if Keller and Tischbein violated any Aerotek rules, nor was Drye aware of any security violation by Keller and Tischbein.[148]

Denise Stevenson was the CSS in Plaintiff's Lebanon office until January 20, 2015, when Auker assumed that role.[149] Plaintiff never had any problems at work in the year 2014 when Stevenson was her supervisor.[150]

Aside from the Plaintiff, Ms. Auker has not had any Hispanic workers report to her while working for Defendant, other than a temporary contract employee, who was not an internal employee of Aerotek. That contract employee started in September 2017, well after Plaintiff's termination, and was hired while Ms. Auker was on maternity leave.[151]

In addition to her duties as an Administrative Assistant, Plaintiff performed translation services for Spanish speaking contractors (i.e. job seekers) who could not speak English.[152] Auker, in her role as CSS, told Plaintiff that she did not want Plaintiff translating for contractors who needed assistance. She required that contractors who needed a translator go home and come back with their own translator.[153] Auker does not recall telling Plaintiff not to translate for Spanish-

---

[148] *Id.* ¶ 76.

[149] Pl.'s Add. SMF ¶ 77.

[150] *Id.* ¶ 78; Pl.'s Dep. (ECF No. 32-2) at 29.

[151] *Id.* ¶ 81.

[152] *Id.* ¶ 82.

[153] *Id.* ¶ 83.

speaking contractors nor did she think about whether such a practice was valuable or troublesome.[154]

Davila did not believe that Plaintiff's translating for contractors interfered with her ability to do her job. In fact, Plaintiff's translating for contractors was more efficient and cut down the time process versus requiring the contractors to go home and come back with a translator.[155] Michael Dougherty, who was Director of Business Operations over several Pennsylvania Aerotek offices in 2008, including the Lebanon office where Plaintiff worked, testified that he was aware that Plaintiff did translating, and that Administrative Assistants are encouraged to be bi-lingual.[156]

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 permits a court to enter summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[157] Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party."[158]

---

[154] Auker Dep. (ECF No. 36) at 47-48.

[155] Pl.'s Add. SMF ¶ 84.

[156] *Id.* ¶ 85.

[157] Fed. R. Civ. P. 56(a).

[158] *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The summary judgment movant has the initial burden of stating the basis for the motion and identifying those portions of the record—depositions, documents, affidavits, admissions, interrogatory answers, or other materials—that it believes demonstrate an absence of a genuine dispute of material fact.[159] "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof."[160] In assessing whether the moving party has satisfied its burden, the Court does "not engage in credibility determinations, and [] view[s] the facts and draw[s] all reasonable inferences in the light most favorable to the nonmovant."[161]

Once the moving party shows an absence of evidence to support the nonmoving party's claims, then the nonmoving party must rebut the motion with facts in the record and cannot rest solely on assertions in the pleadings.[162] The nonmoving party must present affirmative evidence that is adequate as a matter of law to sustain a judgment in its favor; the evidence must not be colorable,

---

[159] *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).

[160] *Conoshenti*, 364 F.3d at 140 (quoting *Singletary v. Pa. Dep't. of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001)).

[161] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 533 (3d Cir. 2017) (citations omitted).

[162] *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

conclusory, or speculative.[163]  "A non-moving party may not rest upon mere

allegations, general denials or vague statements."[164]  Subjective belief alone is

insufficient to create an issue of fact.[165]  If the nonmoving party "fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden at trial," summary judgment is

appropriate.[166]  Finally, for evidence to be properly considered at summary

judgment, the proponent must be able to demonstrate that such evidence can be

produced in a form that would be admissible at trial.[167]

## III.   LOCAL RULE 56.1 PROCEDURAL ISSUE

In its reply brief, Defendant argues the Court should ignore Plaintiff's

"Additional Undisputed and Material Facts," set forth at the end of Plaintiff's

"Responsive Statement of Undisputed Material Facts."  Defendant contends the

additional statement of facts violates Local Rule 56.1 because the Rule only

permits the nonmoving party to submit a statement of facts responding to the

numbered paragraphs of the moving party's statement of facts, not to supply

---

[163]  *Davis v. Pa. Tpk. Comm'n*, 204 F. Supp. 3d 793, 800 (M.D. Pa. 2016) (Kane, J.) (citing *Anderson*, 477 U.S. at 249-50).

[164]  *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992)(internal quotation marks, alterations and quoted case omitted); *Hammonds v. Collins*, No. 12-CV-236, 2016 WL 1621986, at *5 (M.D. Pa. Apr. 20, 2016)(Brann, J.).

[165]  *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013)(nonprecedential).

[166]  *Celotex*, 477 U.S. at 322.

[167]  *See Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 & n.13 (3d Cir. 1999); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1246 (3d Cir. 1993); *see also* Fed. R. Civ. P. 56(c)(2).

additional statements. In part, Defendant maintains that Plaintiff's submission of additional facts defeats the purpose of the Rule, which is to "enable the court to identify contested facts expeditiously and prevent factual disputes from becoming obscured by a lengthy record."[168]

Defendant also asserts that Plaintiff submitted the additional facts, which it contends are immaterial, "in an attempt to ensure that the Court *does not* identify contested facts expeditiously."[169] Elsewhere in its reply brief, Defendant contends that the additional facts "serve[ ]only to muddy the record,"[170] and that statements of facts should not include "argument, equivocations, immaterial or unsupported assertions, opinions, [or] commentary . . . ."[171]

The Court provides some background. In accord with Middle District of Pennsylvania Local Rule 56.1, Defendant filed a "Statement of Undisputed Material Facts" in numbered paragraphs, including a citation to the parts of the record supporting each statement. Local Rule 56.1 requires the non-moving party to respond to the numbered paragraphs and provides that any material facts in the moving party's statement not objected to are deemed admitted. In accord with the Rule, Plaintiff filed a "Responsive Statement" to Defendant's statement of material

---

[168] *Park v. Veasie*, No. 09-CV-2177, 2011 WL 1831708, at *3 (M.D. Pa. May 11, 2011)(Rambo, J.)(internal quotation marks and quoted case omitted)(brackets omitted).

[169] Def.'s Reply Br. (ECF No. 34) at 5-6 (emphasis in original).

[170] *Id.* at 4 n.2.

[171] *Id.* at 5, quoting *Park*, 2011 WL 1831708, at *4.

facts corresponding to Defendant's numbered paragraphs, either admitting those facts or contending there exists a genuine issue to be tried on certain facts. In accord with Rule 56.1, Plaintiff's statements also included citations to the record.[172]

But Plaintiff did more than that. As a continuation of its Responsive Statement to Defendant's statement of material facts, it filed "Additional Undisputed and Material Facts" in numbered paragraphs, continuing with the numbering where Defendant's numbered paragraphs left off.[173] Plaintiff set forth nine additional numbered paragraphs covering nearly two pages. These additional statements were also supported by citations to the record.

Defendant first argues that the additional statements violate Rule 56.1 because the Rule does not provide for such statements, only for statements

---

[172] In pertinent part, Local Rule 56.1 reads as follows:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

> Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

[173] Pl.'s Resp. (ECF No. 32) at 13-15.

responding to the moving party's statements.  Defendant is correct on a literal reading of the Rule, but I disagree that the additional statements are not permissible.  A District Court has discretion to depart from the requirements of a local rule.[174]  It may depart "where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment."[175]

Here, the Court has a sound rationale for departing from the local rule.  As argued by Plaintiff, allowing the additional statements permits the nonmoving party to present all the evidence that it believes would rebut the motion for summary judgment.  Further, Defendant has not argued that it suffered unfair prejudice from allowing the additional statements.

As noted, Defendant does argue that the additional statements "muddy the record" and were submitted "in an attempt to ensure that the Court does not identify contested facts expeditiously."  But such defects, if true, are not traceable to the mere filing of additional statements.  Such defects can arise even in statements specifically contemplated by Rule 56.1, that is, statements submitted in

---

[174]  *United States v. Eleven Vehicles*, 200 F.3d 203, 204-05 (3d Cir. 2000).

[175]  *Id.* at 215. S*ee also Park v. Tsiavos*, 679 F. App'x 120, 122 n.2 (3d Cir. 2017)(nonprecedential)(district court did not abuse its discretion in accepting a defendant's statement of material facts on summary judgment that were not set forth in a separate document as required by a local rule)(citing *Eleven Vehicles*).

support of a summary judgment motion or statements responding to the numbered paragraphs of the moving party's statement.[176]

In the exercise of the Court's discretion, I will consider Plaintiff's "Additional Undisputed and Material Facts." In doing so, I disagree with Defendant that the additional statements should not be considered because they muddy the record or prevent the Court from identifying contested facts expeditiously. Review of the nine additional statements reveals that they present concise statements of fact, supported by record citations. They may eventually be found not particularly germane to the resolution of the summary judgment motion, but that is not a reason to exclude them initially from the summary judgment record when the nonmoving party represents them as material to the motion.[177]

---

[176] *See Park*, 2011 WL 1831708, at *2-4.

[177] *See Zaloga v. Borough of Moosic*, No. 10-CV-2604, 2015 WL 3755003, at *4 (M.D. Pa. Jun. 16, 2015)(Brann, J.)(the nonmoving party's additional paragraphs are not contemplated by Local Rule 56.1, but the court nonetheless accepts them because they are supported by citations to the record and because the moving parties "framed the issue narrowly in their statement of material facts" so that the additional facts are filed "to complete the narrative surrounding the parties' dispute"), *rev'd on other grounds*, 841 F.3d 170 (3d Cir. 2016); *Nitterhouse Concrete Products, Inc. v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union*, No. 15-CV-2154, 2018 WL 656013, at *2 (M.D. Pa. Feb. 1, 2018)("Although the Union's submission of additional facts does not precisely conform with Local Rule 56.1, the facts are supported by citations to the record, and hence the court believes it should take them into account if they are material. The Union certainly has the right to submit evidence material to a resolution of summary judgment.").

## IV.  ANALYSIS

In her Complaint, Plaintiff sets forth three causes of action.[178]  In Count I, she makes a claim under Title VII that the refusal to promote her to the CSA position was illegally based on her national origin and race.  In Count II, she makes a claim under Title VII that her termination from the Administrative Assistant position was illegally based on her national origin and race.  In Count III, she makes a claim under 42 U.S.C. § 1981 that Defendant intentionally discriminated against her to deprive her on the basis of her race of the contractual benefits of her employment with Defendant.  Although it was not pled in the Complaint, the parties are also litigating on summary judgment claims under the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951 *et seq.*, that the failure to promote Plaintiff and her termination were improperly based on her national origin and race.

Employment discrimination claims under 42 U.S.C. § 1981 are generally subject to the same analysis as discrimination claims based on Title VII.[179]  The

---

[178]  Compl. (ECF No. 1).

[179]  *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (citation omitted).  This identical analysis includes applying the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when appropriate.  *Id.*  Section 1981 claims differ in important ways from Title VII claims, such as the time limitations for filing suit, whether administrative exhaustion is required, the type of discrimination protected against, and the type of worker who can maintain a claim.  *See, e.g.*, *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).  However, none of substantive distinctions between Title VII and Section 1981 claims appear to be at issue in the instant case.

same is true for such claims under the PHRA.[180]  Thus the Court need only analyze Plaintiff's claims under the pertinent Title VII law.  If summary judgment is proper, or improper, on the merits of the Title VII discrimination claims, the same result would necessarily follow for the parallel Section 1981 and PHRA discrimination claims.

In arguing their positions on summary judgment, both sides begin by relying on the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green* for analyzing "pretext" cases under Title VII.[181]  In the first step, the plaintiff must establish a *prima facie* case of discrimination.[182]  To establish a *prima facie* case of employment discrimination, the plaintiff must show that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."[183]

At the *prima facie* stage, the plaintiff "must establish some causal nexus between [her] membership in a protected class" and the employment decision.[184]

---

[180]  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409-10 (3d Cir. 1999)(analysis is the same for Title VII, PHRA and Section 1981 claims and applying Title VII law to all the claims).

[181]  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

[182]  *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

[183]  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

[184]  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

The Third Circuit has noted that "there is a low bar for establishing a *prima facie* case of employment discrimination."[185]

If a plaintiff establishes a *prima facie* case of discrimination, in the second step, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action."[186] If the defendant employer meets this burden, in the third step, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination."[187]

## A. The Failure-to-Promote Claim

In moving for summary judgment on the failure-to-promote claim, Aerotek argues that Plaintiff cannot establish a *prima facie* case for two reasons.[188] First, she cannot satisfy the second element of a *prima facie* case, that she was qualified for the CSA job. Second, she cannot satisfy the fourth element, that she did not get the job in circumstances giving rise to an inference of intentional discrimination.

---

[185] *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (citing *Ezold v. Wolf*, 983 F.2d 509, 523 (3d Cir. 1993)).

[186] *Makky*, 541 F.3d at 214 (citation omitted).

[187] *Id.* (citation omitted).

[188] Because Plaintiff has made claims under Title VII, Section 1981 and the PHRA, there is more than one such claim. However, I refer to it in the singular because only Title VII analysis will be used.

## 1. Whether Plaintiff Was Qualified for the CSA Position

Defendant contends the following evidence shows that Plaintiff was not qualified for the CSA position. First, she interviewed poorly for the position.[189] During her interview on June 29, 2015, with Auker and Dougherty, despite having worked closely with Davila, the previous CSA, for over a year and a half, she struggled to detail the responsibilities of the CSA role, seemed unprepared, did not appear to take the interview seriously, and asked no questions about the position or its duties.[190]

Second, Defendant contends it could have refused to give Plaintiff the job on the basis of her poor performance in the interview, but Auker decided to give her another opportunity to earn the position by way of a working interview.[191] Aerotek does not typically give working interviews to job candidates.[192] The working interview lasted about a month, and was the first and only working interview Auker ever gave to an employee.[193] Defendant contends that the opportunity for a working interview means that Auker gave Plaintiff more consideration than any other candidate for the CSA job.

---

[189]  Def.'s SMF ¶ 16; Auker Decl. (ECF No. 30-1) ¶ 15; Dougherty Dep. (ECF No. 30-6) at 29.

[190]  *Id.* ¶ 17; Auker Decl. (ECF No. 30-1) ¶ 16; Auker Dep. (ECF No. 30-5) at 51; Dougherty Dep. (ECF No. 30-6) at 29.

[191]  Def.'s SMF ¶ 18; Auker Decl. (ECF No. 30-1) ¶ 18; Auker Dep. (ECF No. 30-5) at 53-54.

[192]  Def.'s SMF ¶ 23.

[193]  *Id.* ¶¶ 24 and 26.

Third, during the working interview, Aerotek provided Plaintiff with the resources to succeed. Plaintiff completed training modules during the working interview, worked with Davila, and had weekly meetings with Auker to learn the duties of the position.[194] Both Auker and Davila were available throughout the working interview and helped Plaintiff whenever she needed it,[195] with Auker reaching out on a daily basis to see if Plaintiff needed help.[196]

Defendant contends that, despite the resources made available to Plaintiff, her "performance of the CSA duties in the working interview was riddled with errors, missed deadlines, poor time management and inattention to detail."[197] Defendant maintains that "the outcome of the working interview clearly demonstrate[s] that [Plaintiff] was not qualified for the CSA position."[198]

In opposition, Plaintiff asserts that she "interviewed well" during the June 29 interview,[199] and that "she was well aware of what the position was about, having worked closely with Ms. Davila and covered for her from time to time over the

---

[194]  *Id.* ¶ 25; Auker Decl. (ECF No. 30-1) ¶ 24; Auker Dep. (ECF No. 30-5) at 56-57.

[195]  Def.'s SMF ¶ 33; Pl's Dep. (ECF No. 30-2) at 61 (Plaintiff did not ask for any specific resources that Auker failed to provide her, and Davila helped her when Plaintiff sought help from her).

[196]  Def.'s SMF ¶ 32; Auker Dep. (ECF No. 30-5) at 61.

[197]  Def.'s Br. in Supp. (ECF No. 28) at 7.

[198]  *Id.*

[199]  Pl.'s Opp'n Br. (ECF No. 33) at 7; Pl.'s Resp. ¶ 16; Pl.'s Dep. (ECF No. 32-2) at 46 (Plaintiff testifies that she "honestly think[s] [she] interviewed well").

preceding year and a half."[200]  Additionally, rather than award Plaintiff the position at the end of the oral interview, Plaintiff was given a working interview.  As Defendant did, Plaintiff points out that a working interview is not a standard practice at Aerotek, and that this was the first and only working interview Auker had ever given.  During the working interview, Plaintiff also performed the Administrative Assistant duties.[201]

Further, "Plaintiff completed the working interview very well and Ms. Davila believed that with formal training, Plaintiff would have been able to do the CSA job."[202]  Zeller, a Caucasian female, was subsequently hired from outside of the organization to fill the CSA position in the Lebanon office and began working in September 2015.[203]  As described by Plaintiff, Zeller's only job after graduating from college was as a babysitter.[204]

Plaintiff sums up as follows:

> The facts of record clearly indicate that Plaintiff was
> qualified for the CSA position.  Plaintiff had worked
> closely with Ms. Davila when Ms. Davila was the CSA

---

[200]  Pl.'s Opp'n Br.at 7; Pl.'s Resp. ¶ 17; Pl.'s Dep. (ECF No. 32-2) at 45-47.  Plaintiff averred at her deposition, in response to an inquiry whether she had asked any questions at the interview, that she "kind of already knew what the position was about."  Pl.'s Dep. (ECF No. 32-2) at 47.

[201]  Def.'s SMF ¶ 20.

[202]  Pl.'s Opp'n Br. at 7; Pl.'s Dep. (ECF No. 32-2) at 59; Pl.'s Resp. ¶ 36. Davila Dep. (ECF No. 32-3) at 39.

[203]  Def.'s SMF ¶ 40.

[204]  Pl.'s Resp. ¶ 41; Zeller Dep. (ECF No. 32-4) at 40-41; Pl.'s Dep. (ECF No. 32-2) at 78. More accurately, after graduation, Zeller had two nanny jobs, a day care teacher job, and a weekend job in a sporting goods store.  Pl.'s Resp. ¶ 41; Zeller Dep. (ECF No. 32-4) at 6-7.

in the Lebanon office and covered for Ms. Davila's
duties from time to time during the year and a half they
worked together. Plaintiff performed both the CSA and
Administrative Assistant duties during a working
interview which went very well. Additionally, Plaintiff's
experience working for Aerotek clearly made her more
qualified for the CSA role than Ms. Zeller, who was
ultimately hired from outside the company to fill the
CSA role, and whose only job experience out of college
was working as a babysitter. Ms. Davila also believed
Plaintiff could have performed the CSA role with formal
training. As such, Plaintiff meets the second element
with respect to being qualified for the CSA position.[205]

In reply, Defendant argues that Plaintiff's evidence is not sufficient to show

that she was qualified for the CSA job because her evidence is her own

unsubstantiated, subjective belief that she interviewed well for the position and that

she completed the working interview very well. Defendant contrasts this evidence

with Auker's testimony that she did not promote Plaintiff because of the errors she

made during the working interview, testimony supported by e-mails indicating

deficiencies in Plaintiff's performance, and Plaintiff's own admission that she

made, as Defendant puts it, "multiple errors" throughout the working interview.[206]

In disposing of this issue, the Court initially notes that both parties have

presented evidence on the issue of whether Plaintiff was qualified for the CSA job

that appears to be more appropriately considered in connection with the fourth

element of a *prima facie* case, whether she did not get the job in circumstances

---

[205]   Pl.'s Opp'n Br. (ECF No. 33) at 8.

[206]   Def.'s Reply Br. (ECF No. 34) at 7.

giving rise to an inference of intentional discrimination. The Court will focus on the evidence relevant to whether she was qualified for the job.

Here, to counter Defendant's evidence that she was not qualified for the CSA job, Plaintiff presents the following evidence: (1) her subjective belief that she "interviewed well for the position";[207] (2) her subjective belief that she "completed the working interview very well";[208] (3) her conclusional assertion that she had worked closely with Davila when Davila was the CSA in the Lebanon office and covered for Davila's duties from time to time during the year and a half they worked together;[209] and (4) Davila said she could have performed the CSA job with formal training.

This evidence is not sufficient for Plaintiff to meet her burden on summary judgment. As noted, a non-moving party may not rest upon vague statements, or a subjective belief standing alone. The first two items of evidence represent Plaintiff's subjective belief that she interviewed well and that the working interview went well. The third is conclusional. The fourth item actually supports the conclusion that Plaintiff was not qualified.

---

[207]  Pl.'s Resp. ¶ 16.  The response is based on  Pl.'s Dep. (ECF No. 32-2) at 46 where Plaintiff testifies that she "honestly think[s ] [she] interviewed well."

[208]  For this assertion, Plaintiff relies on her deposition testimony that she honestly think[s] [she] did great during the working interview . . . I feel like I was given the working interview with the CSA role along with my job.  They kind of consolidated everything, and they just kind of gave everything to me at once."  ECF No. 32-2 at 59.

[209]  This assertion is based on Plaintiff's deposition testimony that she used to cover for Davila whenever she went on vacation, for "that week" of vacation.  Davila "showed" her "the job" and "kind of taught" Plaintiff "some things about it."  Pl.'s Dep. (ECF No. 32-2) at 45-46.

The Court notes that by way of e-mails Defendant presented (at least four) instances of errors Plaintiff made during the approximate one month working interview.[210] Further, Plaintiff admitted that at least two of the instances were her errors[211] and a third probably was.[212] In light of this evidence, although her performance of the CSA duties in the working interview may not have reached the level where I could say, as Defendant does, that it was "was riddled with errors, missed deadlines, poor time management and inattention to detail," I cannot agree with Plaintiff that she has presented sufficient evidence that a reasonable jury could conclude that she was qualified for the CSA position.

Plaintiff has thus failed to satisfy the second element of a *prima facie* case in regard to her failure-to-promote claim.

### 2. Whether the Failure to Promote Occurred Under Circumstances that Could Give Rise to an Inference of Intentional Discrimination

Defendant argues Plaintiff fails to satisfy the fourth element of a prima facie case because there is no evidence that the circumstances surrounding the failure to promote Plaintiff could give rise to an inference of intentional discrimination on the bases of race and national origin, or as Defendant alternatively puts it, there is

---

[210] Pl.'s Dep. (ECF No. 30-2) at 61-76 and accompanying exhibits.

[211] Pl.'s Dep. (ECF No. 30-2) at 68, 73-74.

[212] Pl.'s Dep. (ECF No. 30-2) at 70-71.

no evidence of a causal connection between the failure to promote and Plaintiff's race and national origin.

Defendant relies on the following. First, Auker declined to promote Plaintiff only after the month-long working interview showed she could not do the job. Defendant argues that "[t]he undisputed evidence shows a multitude of errors, missed deadlines, inattention to detail and poor time management . . ."[213] Second, "[t]he record also shows that Auker made a concerted effort to provide [Plaintiff] with support and training throughout the working interview—in addition to Davila acting as a resource—yet her performance deficiencies persisted."[214] Third, the evidence shows that "Aerotek gave Plaintiff more consideration than any other applicant for the position" because she was the only one given an exclusive opportunity to earn it by way of the working interview.[215]

Defendant argues that the hiring of Zeller, a Caucasian woman, does not indicate discriminatory animus as Plaintiff "admits she made a series of mistakes during her working interview," although conversely she did not observe Zeller making any mistakes during the time she worked with Zeller.[216] Further, Zeller

---

[213] Def.'s Br. in Supp. (ECF No. 28) at 7-8.

[214] *Id.* at 8.

[215] *Id.*

[216] *Id.*; Def.'s SMF ¶42.

was not even under consideration for the position until Plaintiff failed both the oral interview and the working interview.[217]

In opposition, Plaintiff argues the following evidence establishes that she was not promoted and then terminated because of unlawful discrimination. Her first three arguments apply to both claims. As will be seen, Plaintiff then makes arguments specific to each claim.

Those first three arguments are as follows. First, Denise Stevenson was the CSS in the Lebanon office until Auker replaced her on January 20, 2015, and Plaintiff never had any problems at work in 2014 when Stevenson was her supervisor.[218]

Second, "[o]ther than Plaintiff, Ms. Auker has not had any Hispanic workers report to her while working for Aerotek, other than a temporary contract employee, who was not an internal employee of" Aerotek. The contract employee "started in September 2017, well after Plaintiff's termination, and who was hired while Ms. Auker was on maternity leave."[219] Plaintiff asserts that this is evidence that Defendant discriminated against Plaintiff on the basis that she was Hispanic.

Third, Auker was "overtly hostile" to Plaintiff and other Hispanics by way of her opposition to Plaintiff's doing translations for Spanish-speaking

---

[217] Def.'s SMF ¶¶ 37 and 38.

[218] Pl.'s Opp'n Br. (ECF No. 33) at 8-9; Pl.'s Add. SMF ¶¶ 77-78; Pl.'s Dep. (ECF No. 32-2) at 29.

[219] Pl.'s Opp'n Br. at 9; Pl.'s Add. SMF ¶ 81.

contractors.[220]  Auker told Plaintiff she did not want her doing translations; instead, the contractors were to go home and come back with their own translators.[221]  For her part, Davila did not believe that Plaintiff's translating interfered with her ability to do her job.  Davila thought it was more efficient and less time consuming than sending a contractor home to get a translator.[222]  Dougherty also believed it was favorable for Administrative Assistants to be bilingual and knew that Plaintiff was translating for contractors.[223]

Focusing specifically on the failure-to-promote claim, Plaintiff points to additional evidence.  First, Auker told Plaintiff she would get the CSA job after the working interview and then Plaintiff was not given the proper training.[224]  Second, during the working interview, she was required to do the Administrative Assistant job and the CSA job without being permitted to work overtime while Davila and Zeller, both Caucasian, were allowed to work overtime while they were performing both of those jobs.[225]  Third, the CSA job was given to Zeller, a Caucasian, even though she was less qualified than Plaintiff and Plaintiff had a successful working interview.[226]

---

[220]  Pl.'s Opp'n Br. (ECF No. 33) at 9; Pl.'s Add. SMF ¶ 82.

[221]  Pl.'s Add. SMF ¶ 83.

[222]  *Id.* ¶ 84.

[223]  *Id.* ¶ 85.

[224]  Pl.'s Opp'n Br. (ECF No. 33) at 11-12.

[225]  *Id.* at 12.

[226]  *Id.*

In response, Defendant argues the following. First, Plaintiff cannot rely on the absence of Aerotek Hispanic workers under Auker's supervision with the exception of Plaintiff and a temporary contract worker because, in part, there is no evidence of applicant pools or hiring decisions that would indicate intentional discrimination on Auker's part. Second, Plaintiff's assertion that Auker told her not to provide translation services for Hispanic contractors lacks evidence or context to indicate it was motivated by anti-Hispanic animus.[227] Defendant also maintains Auker's alleged remark is unrelated to the failure-to-promote and termination claims. Third, Plaintiff's claim she was told she would get the job after the working interview is contradicted by the record, more specifically Auker's June 30, 2015 e-mail, saying there was no guarantee she would be promoted. And any such comment by Auker, in any event, actually undermines her case as Auker knew Plaintiff was Hispanic when she offered her the working interview.

In ruling on whether Plaintiff has satisfied the fourth element of her *prima facie* case, the Court must examine "the totality of the evidence" "rather than the

---

[227] Defendant also denies that she made this remark. However, the citation to her deposition to support her denial only indicates she does not recall making the statement. Auker Dep. (ECF No. 36) at 47-48. And Defendant admits Plaintiff's statements concerning Auker's translation remarks. Pl.'s Add. SMF ¶¶ 82-85.

strength of each individual argument."[228]  The Court will start with Plaintiff's

position since Plaintiff has the burden of showing she has a *prima facie* case.

First, Plaintiff points out that she never had any problems at work in 2014

when Denise Stevenson, the CSS in the Lebanon office until Auker replaced her on

January 20, 2015, was her supervisor.  This evidence is immaterial as a vague

showing that Plaintiff did not have "problems" with a previous supervisor sheds no

light on her later supervisor's alleged racial animus in connection with either a

failure to promote or a termination.  It is so negligible that it cannot be considered

even in combination with other evidence.

Second, Plaintiff relies on evidence that Auker has not had any Hispanic

workers report to her while they worked for Aerotek, other than Plaintiff, and a

temporary contract employee, not hired by Auker, who was not an internal

employee of Aerotek.  Contrary to Plaintiff's position, this is not evidence that

Defendant discriminated against her.  This evidence is again so negligible that it

cannot be considered even in combination with other evidence.

Third, Plaintiff argues that Auker was "overtly hostile" to Plaintiff and other

Hispanics by way of her opposition to Plaintiff's doing translations for Spanish-

speaking contractors.  As noted, according to Plaintiff, Auker told Plaintiff she did

not want her doing translations.  Plaintiff buttressed this argument with evidence

from Davila and Dougherty indicating that translating would not interfere with

---

[228] *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997).

Plaintiff's ability to do her job and that being bilingual was a positive attribute for her job.

The Court believes that if Auker told Plaintiff not to translate for Spanish-speaking contractors and that these contractors were told to go home and bring their own translators, it would be some evidence of racial bias but hardly the "overtly hostile" attitude Plaintiff asserts. There could be an acceptable business reason for this, something as simple as not wanting Administrative Assistants to get involved in translating for contractors, even if others could reasonably disagree with such a policy. The instruction is akin to a stray remark by a decision-maker unrelated to the decision-making process. Such remarks "are rarely to be given weight,"[229] but could provide background evidence relevant to whether there was a discriminatory motive,[230] even if they may not, standing alone, give rise to an inference of discrimination.[231]

I conclude that Auker's instructions viewed independently are not sufficient to give rise to an inference of discrimination. They may, however, in combination with other circumstances, be sufficient. As noted above, Plaintiff points to additional evidence focused specifically on the failure-to-promote claim. I look at that evidence now.

---

[229] *Doe v. C.A.R.S Protection Plus, Inc.*, 527 F.3d 358, 368 (3d Cir. 2008).

[230] *Id.*

[231] *Id.*

First, Auker told Plaintiff she would get the CSA job after the working interview, but then Plaintiff was not given the proper training. Plaintiff relies on the following evidence. While Plaintiff worked with Davila during the working interview, Davila admitted that because of her own workload, she was not able to train Plaintiff the way she needed to, and Davila told Auker she did not have time to train Plaintiff.[232] Additionally, when Auker advised Plaintiff that Plaintiff would not get the CSA role after the working interview, Auker admitted to Plaintiff that Auker was not there for her.[233] Moreover, Davila stated that if Plaintiff had been given "formal training," she would have been able to do the CSA job.[234] In this regard, training is different for a new hire at Aerotek for the CSA position. The new hire would be given formal training by way of modules that the new hire completes to learn the job.[235] In contrast, Plaintiff did not complete those modules before she started her working interview.[236]

I agree with Defendant's position stated in its supporting brief that the way in which Plaintiff was trained during the working interview does not support an inference of discrimination. For the purpose of the summary judgment motion, it is true that Davila admitted that because of her own workload, she was not able to

---

[232] Pl.'s Resp. ¶ 25; Davila Dep. (ECF No. 32-3) at 36-37.

[233] Pl.'s Resp. ¶ 25; Pl.'s Dep. (ECF No. 32-2) at 83-84.

[234] Pl.'s Resp. ¶ 36; Davila Dep. (ECF No. 32-3) at 39.

[235] Pl.'s Add. SMF ¶ 80.

[236] *Id.*

train Plaintiff the way she needed to, and that Davila told Auker she did not have time to train Plaintiff. It is also true for the purpose of the motion that when Auker advised Plaintiff that Plaintiff would not get the CSA role after the working interview, Auker admitted to Plaintiff that Auker was not there for her. I also accept that Plaintiff did not complete the modules before starting the working interview.

However, there is other evidence that bears on the discrimination issue. Plaintiff had weekly meetings with Auker and failed to address issues that were raised at those meetings.[237] Auker reached out to Plaintiff on a daily basis to see if she needed any help or support and most times Plaintiff did not respond to Auker's inquiries.[238] Plaintiff admits that both Auker and Davila provided her with help when she sought assistance from them.[239] Finally, during the working interview, Plaintiff never expressed to Auker that she felt that she was not getting enough support or training.[240] In light of this additional evidence, admissions by Davila that she was not able to train Plaintiff the way she needed to and by Auker that she was not there for Plaintiff do not give rise to an inference of discrimination.

---

[237]  Def.'s SMF ¶ 30; Auker Dep. (ECF No. 30-5) at 59.

[238]  Def.'s SMF ¶ 32; Auker Dep. (ECF No. 30-5) at 61.

[239]  Def.'s SMF ¶ 33; Pl's Dep. (ECF No. 30-2) at 61 (Plaintiff did not ask for any specific resources that Auker failed to provide her, and Davila helped her when Plaintiff sought help from her).

[240]  Def.'s SMF ¶ 34.

Second, Plaintiff relies on evidence that during the working interview, she was required to do the Administrative Assistant job and the CSA job without being permitted to work overtime[241] while Davila and Zeller, both Caucasian, were allowed to work overtime while they were performing both of those jobs.[242] Aerotek denies that Plaintiff was denied overtime and asserts that Auker gave her any overtime she requested during the working interview. However, I accept Plaintiff's evidence for the purpose of this motion. In doing so, while this evidence is insufficient by itself to give rise to an inference of discrimination, it may prove sufficient in combination with other evidence.

Third, Plaintiff argues the evidence shows that the CSA job was given to Zeller, a Caucasian, someone from outside Aerotek, less qualified than Plaintiff, and following Plaintiff's successful working interview. Plaintiff relies on evidence that Zeller was given opportunities not allowed Plaintiff, such as being able to train for the CSA job without having to also perform the Administrative Assistant job.[243] She also points out that Zeller told Plaintiff and Davila that the only job she had after college was as a babysitter.[244]

---

[241] Pl.'s Resp. ¶ 21; Pl.'s Dep. (ECF No. 32-2) at 80-81.

[242] Pl.'s Resp. ¶ 21; Davila Dep. (ECF No. 32-3) at 17-18; Pl.'s Dep. (ECF No. 32-2) at 80-81; Def.'s Reply (ECF No. 35) to Pl.'s Resp. ¶ 21.

[243] Pl.'s Add. SMF ¶ 79; Pl.'s Dep. (ECF No. 32-2) at 79.

[244] Pl.'s Resp. ¶ 41; Zeller Dep. (ECF No. 32-4) at 40-41; Pl.'s Dep. (ECF No. 32-2) at 78.

Defendant argues that the hiring of Zeller does not indicate discriminatory animus as Plaintiff "admits she made a series of mistakes during her working interview" but that she did not observe Zeller making any mistakes during the time she worked with Zeller. Further, Zeller was not even under consideration for the position until Plaintiff failed both the June 29 interview and the subsequent and prolonged working interview.

I agree with Defendant that the hiring of Zeller is not probative of discrimination. First, I have already concluded that Plaintiff was not qualified for the CSA job, so Plaintiff cannot claim to be more qualified than Zeller. Second, it is likely that Zeller was able to train for the CSA job without having also to perform the Administrative Assistant job simply because Plaintiff held the Administrative Assistant job during Zeller's training as Zeller was hired in September 2015[245] and Plaintiff was terminated on October 22, 2015.[246]

I consider together only the circumstances that: (1) Auker told Plaintiff she did not want her doing translations for Spanish-speaking contractors and that instead the contractors were to go home and come back with their own translators; and (2) Plaintiff was required to do the Administrative Assistant job and the CSA job without being permitted to work overtime while Davila and Zeller, both Caucasian, were allowed to work overtime while performing both of those jobs. I

---

[245] Def.'s SMF ¶ 40.

[246] *Id.* ¶ 72.

also consider the circumstance that Plaintiff was the only Aerotek employee given the opportunity to earn a job by way of a working interview.

Given the latter circumstance, the first two circumstances are not sufficient to meet Plaintiff's burden on summary judgment to establish the fourth element of the prima facie case.

In sum, Plaintiff has failed to establish two elements of her *prima facie* case on her failure-to-promote claim, both that she was qualified for the job and that the circumstances could give rise to an inference of discrimination.

### 3. Whether Aerotek's Reason for Not Promoting Plaintiff Was Pretextual

Defendant next argues that summary judgment in its favor is proper because Plaintiff cannot meet her burden at step three of the *McDonnell Douglas* burden-shifting analysis. That is, Defendant argues it has articulated a legitimate, non-discriminatory reason for failing to promote Plaintiff, that Plaintiff failed the working interview, and Plaintiff has failed to rebut that reason as pretextual.

At summary judgment, the third step of the *McDonnell Douglas* burden-shifting framework requires the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination."[247] A plaintiff can demonstrate pretext by

---

[247] *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994) and *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008)).

proffering evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason[]; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[248]

Plaintiff relies on the first way of demonstrating pretext. A plaintiff can satisfy the first way by providing evidence that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[249] "In simpler terms, [she] must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."[250]

In arguing that she has satisfied her burden at the third step of the analysis, Plaintiff relies for the most part on the evidence she submitted in connection with the fourth element of the *prima facie* case.[251] She argues:

> As stated previously, in addition to Ms. Auker's overt hostility towards Hispanics, Plaintiff was advised she

---

[248] *Id.* at 427 (quoting *Fuentes*, 32 F.3d at 764).

[249] *Id.* at 427 (citation and internal quotation marks omitted).

[250] *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997). *See also Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3d Cir. 2006)(quoting *Keller*).

[251] Plaintiff can rely on the evidence she submitted on the prima facie case to meet her burden at the pretext stage. *Doe*, *supra*, 527 F.3d at 370 (Lastly, it is important to remember that the *prima facie* case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.").

would be given the CSA role following her working interview and then was not given the proper training. Plaintiff was not permitted overtime to perform both the Administrative Assistant role and CSA role at the same time, an opportunity which was afforded to both Caucasian workers, Ms. Davila and Ms. Zeller. Plaintiff was refused the CSA role following a successful working interview, and the role was awarded to a less qualified outside hire, Ms. Zeller, who was Caucasian.[252]

Based on this evidence, Plaintiff argues that a reasonable factfinder "could conclude that Aerotek's reasons for not promoting Plaintiff are not credible" and hence her claim for failure to promote should proceed.[253]

But the test is not simply whether a fact finder could conclude that the reasons are not credible but instead whether Plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence. I conclude that Plaintiff has not put forth sufficient evidence demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions.

First, I have already decided that Plaintiff did not have a successful working interview. Second, that Zeller was given the job over Plaintiff does not establish pretext as Plaintiff admits she committed errors when doing the job but did not see Zeller make any errors as the CSA; Zeller was thus not less qualified than Plaintiff.

---

[252] Pl.'s Opp'n Br. (ECF No. 33) at 12-13.

[253] Id. at 13.

Also, the reasons given above for deciding that Plaintiff had not met the fourth

element of the *prima facie* case apply here, as well.  I conclude that the arguments

Plaintiff makes do not show that the reason given by Defendant for not promoting

Plaintiff was so plainly wrong that it could not have been Aerotek's real reason.

Accordingly, I will grant summary judgment to Defendant on Plaintiff's

claims based on the failure to promote her to the CSA job.

## B.  The Wrongful Termination Claim

In moving for summary judgment on the termination claim, Defendant

argues Plaintiff fails to satisfy the fourth element of a *prima facie* case because

there is no evidence that the circumstances surrounding her termination give rise to

an inference of intentional discrimination on the bases of race and national origin.

Defendant also argues that Plaintiff cannot meet her burden on the third step of the

*McDonnell Douglas* analysis, that defendant's reason for discharging her was

pretextual.

### 1.  Whether the Termination Occurred Under Circumstances that Could Give Rise to an Inference of Intentional Discrimination

Defendant contends that the circumstances of Plaintiff's discharge do not

give rise to an inference of intentional discrimination as Plaintiff was discharged

because she violated an Aerotek policy concerning the security of Individual

Assessment forms.  According to Defendant, and as noted in more detail above, the

process of obtaining background information from candidates is designed so that

Administrative Assistants and other FSG employees do not have access to the contents of background checks or Individual Assessment forms.  An Administrative Assistant's only role is to obtain authorization forms and contact information from candidates.  The only exception occurs when a candidate needs an Administrative Assistant to fax an Individual Assessment form to Sterling Talent Solutions.

Aerotek asserts that on October 22, 2015, DuCellier, Aerotek's Compliance Supervisor in its Background Investigation Department, contacted Auker and stated that there was a security breach in a background check process in that Plaintiff did not follow Aerotek protocol with respect to a contractor's completed Individual Assessment form.[254]

In connection with that Individual Assessment form, Aerotek maintains that Plaintiff violated company policy in the following ways.  In an e-mail dated October 16, 2015, Plaintiff sent to Sterling a candidate's Individual Assessment paperwork prepared for a prior job posting for a subsequent job posting.[255]  (It also appeared that the date of the paperwork had been changed.)[256]  E-mailing the previously completed paperwork indicated to Auker that Plaintiff had saved the

---

[254]  Def.'s SMF ¶ 66, citing in part Auker Decl. (ECF No. 30-1) ¶ 32.

[255]  Def.'s SMF ¶ 67; Auker Decl. (ECF No. 30-1) ¶ 33 ("In violation of Aerotek's policy, Alcantara had forwarded old Individual Assessment paperwork that a candidate/contractor had previously completed for a prior job via e-mail directly to Sterling. (DuCellier Dep. 36:21-38:14; Alcantara Dep. Ex. 17"); Pl.'s Dep. (ECF No. 30-2) Ex. 17, ECF pp. 94-95.

[256]  *Id.* ¶ 67; DuCellier Dep. (ECF No. 30-3) at 38.

paperwork against Aerotek's policy.[257]  Auker investigated the incident and

confronted Plaintiff, who admitted to having saved the paperwork and reviewed it.

According to Auker, Plaintiff thus committed three violations of Aerotek policy:

(1) she e-mailed Individual Assessment documents; (2) she saved paper copies of

the documents; and (3) she assisted contractors in filling the documents out.[258]

Auker consulted with Suzanne Russo, Human Resources Manager for the

Northeast Region of Aerotek, who indicated that Plaintiff's violations of Aerotek's

policy were grounds for termination.[259]

Based on the foregoing evidence, Defendant argues that there are no

circumstances that would give rise to an inference of discrimination.

Conversely, Plaintiff argues there are material issues of fact precluding

summary judgment.  Plaintiff denies the significance of DuCellier's conversation

with Auker.  DuCellier did not tell Auker that there had been a violation of

Aerotek policy, only that DuCellier wanted Auker to look into the situation where

Individual Assessment paperwork for a prior job posting was being submitted for a

subsequent job posting.[260]  No one suggested to DuCellier any particular

---

[257]  *Id.* ¶ 68; Auker Dep. (ECF No. 30-1) ¶ 40.  Further, Auker avers that Plaintiff in fact admitted she had saved the previous paperwork.  Auker Dep. (ECF No. 30-5) at 30.  This averment is contradicted by Plaintiff's deposition testimony that the candidate brought the paperwork back the second time, meaning that Plaintiff had not saved it.  Pl.'s Dep (ECF No. 32-2) at 90.

[258]  Auker Dep. (ECF No. 30-5) at 44-45.

[259]  Def.'s SMF ¶ 71.

[260]  Pl.'s Resp. ¶ 66, citing DuCellier Dep. (ECF No. 32-5) at 37-38.

procedures that Plaintiff may have violated.[261]  Plaintiff also denies the

significance of Auker's contact with Russo as Russo never had any interaction

with Plaintiff and never spoke with Plaintiff about the alleged violations before her

termination.[262]  Russo also did no investigation into Plaintiff's performance or have

anything to do with the Individual Assessment forms before her termination.[263]

Plaintiff denies that she violated Aerotek policy.  She did e-mail the same

Individual Assessment paperwork twice, once on October 1, 2015 for the previous

job, and again on October 16, 2015.[264]  But she did not know that the paperwork

was for different jobs, and the candidate told her that Sterling had not received the

paperwork sent on October 1.[265]  And since the candidate brought the paperwork

with her the second time, Plaintiff had not retained a copy of the paperwork, as

Defendant believes.  Further, the candidate did not ask her any questions about

completing the paperwork; she only asked her to forward it, and that is what

Plaintiff did.[266]  In fact, that contractor had applied through Aerotek's office at

Ingram Micro, so Plaintiff was not involved with that contractor at all other than

---

[261]  Id., citing DuCellier Dep. (ECF No. 32-5) at 40.

[262]  Pl.'s Resp. ¶ 71; Russo Dep. (ECF No.  32-6) at 14-15.

[263]  Id.; Russo Dep. (ECF No.  32-6) at 21.

[264]  Pl.'s Resp. ¶ 67.

[265]  Id. ¶ 68; Pl.'s Dep. (ECF No. 32-2) at 90-91, 94-95.

[266]  Id.; Pl.'s Dep. (ECF No. 32-2) at 91-92.

forwarding the documents to Sterling.[267]  In short,   Plaintiff followed the

procedure Davila had taught her.[268]

As noted, Davila testified that in her experience as an administrative

assistant or CSA, she would help a contractor e-mail or fax an Individual

Assessment form and verbally assist the contractor in filling out the form.  Davila

testified that she was following this process before Plaintiff started.  No one ever

told her it was wrong.  She is still following the same process.[269]

Plaintiff also relies on DuCellier's deposition testimony.  DuCellier stated

that if a contractor brought in Individual Assessment paperwork and she said she

did not have the capacity to fax or email the form, the company "policy is not to

have any involvement.  They would be encouraged to transmit that form directly to

Sterling via a Kinko's or a library, or something like that."[270]  If for some reason,

those options are not available, "the candidate can ask [the Administrative

Assistant] or the CSAs to submit that on their behalf, but the admins and CSAs

should not be reading it, should not be guiding the candidates in any way.  They

should just be transmitting it and provide transmission forms to the candidate, so

they can initially go through; and, again, only at the candidates request."[271]

---

[267]  *Id.*; Pl.'s Dep. (ECF No. 32-2) at 91.

[268]  *Id.* ¶ 65; Pl.'s Dep. (ECF No. 32-2) at 99.

[269]  Pl.'s Resp. ¶ 61. Davila Dep. (ECF No. 32-3) at 32-33.

[270]  *Id.* ¶ 67; DuCellier Dep. (ECF No. 32-5) at 30.

[271]  *Id.*; DuCellier Dep. (ECF No. 32-5) at 30-31.

Plaintiff denies she looked over the paperwork before e-mailing the completed forms to Sterling,[272] asserting that she was simply following the process Davila had taught her. Plaintiff also relies on the deposition testimony of Zeller, the current CSA at the Lebanon office. Zeller testified that she faxes Individual Assessment paperwork and looks at the first page of the form, which has the contractor's name, the date, the position they are applying for and the fax number.[273] Zeller also overheard Plaintiff tell Auker that she did not fill out the Individual Assessment form for the candidate.

Plaintiff relies on the following to establish that she has satisfied the fourth element of a prima facie case:

> In addition to Ms. Auker's overt hostility towards Hispanics, as discussed above, Ms. Auker single-handedly stewarded Plaintiff's termination through to its conclusion by accusing Plaintiff of infractions which either (1) did not occur, (2) were not actual infractions of company policy or (3) were recognized exceptions to company policy. In fact, Ms. Auker's non-Hispanic employees operated under the same IA [Individual Assessment] procedures for which Plaintiff was allegedly terminated. Ms. Davila, a Caucasian employee who taught Plaintiff the IA process, was promoted by Ms. Auker, still works for Ms. Auker, and still follows the same procedures for which Plaintiff was allegedly terminated. Additionally, Plaintiff was alleged by Ms. Auker to have admitted to filling out the IA for the

---

[272] Def.'s SMF ¶ 70; Auker Dep. (ECF No. 30-5) at 33 (Plaintiff told Auker about the first documents that the contractor was confused so she helped that individual fill out the paperwork); Pl.'s Dep. (ECF No. 30-2) at 98 ("look over the documents before I send [them] over.").

[273] Pl.'s Resp. ¶ 70; Zeller Dep. (ECF No. 32-4) at 22-23.

contractor, yet Ms. Zeller overheard the meeting and
testified that Plaintiff specifically told Ms. Auker that she
**did not** complete the paperwork for the contractor. The
totality of the circumstances, including Ms. Auker's
hostility towards Hispanics and her mishandling of
Plaintiff's termination, satisfies the final element needed
to establish Plaintiff's *prima facie* case of race
discrimination.[274]

In reply, Defendant argues that Plaintiff's position is incorrect as it

improperly relies on her own subjective opinion that she did not violate Aerotek

policy when in fact she committed two violations of that policy when she e-mailed

the candidate's Individual Assessment form to Sterling. The first violation was in

retaining a copy of the form. For Defendant, e-mailing the form meant that

Plaintiff had scanned it so that it remained on her computer for a time (thereby

presumably retaining a copy). The second violation was the simple act of e-

mailing the form directly to Sterling. In an apparent attempt to dispel racial

animus on Auker's part, Defendant adds that Auker only became aware of

Plaintiff's conduct (or "breach" as Defendant calls it) after being informed about it

by DuCellier.

Defendant next argues in reply that Davila's testimony concerning sending

e-mails to Sterling is not material as Auker was not aware before this lawsuit was

filed that Davila was e-mailing Individual Assessment paperwork directly to

---

[274] Pl.'s Opp'n Br. (ECF No. 33) at 16-17 (emphasis in original)(brackets added).

Sterling in violation of Aerotek policy.[275] [276]  Finally, Defendant argues that any

suggestion of "overt hostility" by Auker is improperly based only on Plaintiff's

subjective belief.

I do not believe Plaintiff has met her burden on summary judgment of

showing that the circumstances of her termination give rise to an inference of

discriminatory intent on Auker's part.  First, as already concluded above, Auker's

"overt hostility," which is based on her instruction to Plaintiff not to translate for

Spanish-speaking contractors, would be some evidence of racial bias but not the

"overtly hostile" attitude Plaintiff asserts.  Such remarks could provide background

evidence relevant to whether there was a discriminatory motive, if other

circumstances are present.

Second, Plaintiff relies on Davila's testimony to show that she did not

violate Aerotek policy, but the undisputed evidence shows that Auker did not know

about Davila's practices until Plaintiff filed her lawsuit.  Plaintiff also looks to

Zeller's testimony to show policy, but Zeller only testified that she faxed

Individual Assessment forms to Sterling, a practice consistent with Aerotek policy.

Further, it is undisputed that Auker consulted with Suzanne Russo, Human

---

[275]  Auker Decl. (ECF No. 36) ¶ 5.

[276]  In its reply to Pl.'s Resp. ¶ 59, which sets forth Davila's deposition testimony concerning her practices dealing with candidates and their Individual Assessment forms, Defendant denies that Davila's testimony is binding on Aerotek as her position does not give her the authority to make policy decisions in that area.  Def.'s Reply (Doc. 35) ¶ 59.  However, Defendant cites no facts to support this assertion.

Resources Manager for the Northeast Region of Aerotek, who indicated that

Plaintiff's violations of Aerotek's policy were grounds for termination.[277]   In these

circumstances, it is immaterial that Plaintiff denies filling out the form for the

candidate.  I conclude that Plaintiff has failed to provide sufficient evidence to

satisfy her burden on the fourth element of the *prima facie* case.

### 2.  Whether Aerotek's Reason for Terminating Plaintiff Was Pretextual

As noted above, the third step of the *McDonnell Douglas* burden-shifting

framework requires the plaintiff "to provide evidence from which a factfinder

could reasonably infer that the employer's proffered justification is merely a

pretext for discrimination."[278]  A plaintiff can demonstrate pretext in two ways, by

proffering evidence "from which a factfinder could reasonably either (1) disbelieve

the employer's articulated legitimate reason[ ]; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action."[279]  A plaintiff could satisfy the second way "by showing

that the employer in the past had subjected [her] to unlawful discriminatory

treatment, that the employer treated other, similarly situated persons not of [her]

---

[277]  Def.'s SMF ¶ 71.

[278]  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994) and *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008)).

[279]  *Id.* at 427 (quoting *Fuentes*, 32 F.3d at 764).

protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons."[280]

In moving for summary judgment on the termination claim, Defendant argues that Plaintiff has relied on similarly situated employees not of her protected class who were treated more favorably than her to meet her burden on the second way of showing pretext. Defendant then argues that the comparators Plaintiff has identified are not similarly situated and hence Plaintiff cannot show pretext.

However, in opposing summary judgment, Plaintiff does not rely on the second way of showing pretext but on the first way, that is, by proffering evidence that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[281] "In simpler terms," Plaintiff is attempting to show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."[282]

Plaintiff argues that the evidence she submitted in connection with the fourth element of her *prima facie* case on the termination claim also satisfies her burden

---

[280] *Fuentes*, 32 F.3d at 765.

[281] *Id.* at 427 (citation and internal quotation marks omitted).

[282] *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997). *See also Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3d Cir. 2006)(quoting *Keller*).

of showing that the reasons Defendant gave for her termination is unworthy of credence.  As Plaintiff states:

> The facts articulated above easily cast sufficient doubt upon Aerotek's reasons for terminating Plaintiff.  As stated previously, in addition to Ms. Auker's overt hostility towards Hispanics, Ms. Auker's reasons for terminating Plaintiff include misleading and untrue statements.  Although Ms. Auker consulted with Ms. Russo about Plaintiff's termination, Ms. Russo did not do any investigation and relied solely on Ms. Auker's portrayal of the facts.  It was Ms. Auker, and Ms. Auker alone, who terminated Plaintiff.  Plaintiff had been hired prior to Ms. Auker becoming CSS for the Lebanon branch, and Plaintiff, in fact, had experienced no issues while working for the prior CSS, Ms. Stevenson.  Once Plaintiff was terminated from the Lebanon office, it was Ms. Zeller, a newly hired and less qualified Caucasian employee brought onboard by Ms. Auker, who took over Plaintiff's responsibilities.[283]

These are of course matters Plaintiff has raised previously.  For the reasons given immediately above in regard to whether Plaintiff has satisfied her burden on the fourth element of a *prima facie* case, I conclude that she has not shown that the reason given for her discharge is unworthy of credence.  I add that I have already discounted the fact that Plaintiff had experienced no issues while working for Stevenson, the CSS before Auker, concluding that experiencing "no problems" with Stevenson was too vague to be probative of Auker's intent.  I also add that I have already rejected Plaintiff's reliance on whether Zeller was qualified.  Finally, I note that, at the pretext stage, Plaintiff "cannot simply show that the employer's

---

[283]  Pl.'s Opp'n Br. (ECF No. 33) at 17-18 (footnote omitted).

decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[284]  Auker's decision to terminate Plaintiff may have been mistaken or wrong, but Plaintiff has not shown it to be based on discriminatory animus.

### C. *Price Waterhouse* Mixed Motive Analysis

Plaintiff argues that even if there is insufficient evidence to support her claims under the *McDonnell Douglas* framework dealing with pretext claims, under the *Price Waterhouse* framework for analyzing mixed motive cases, there is sufficient evidence to defeat summary judgment.[285]

A plaintiff may rely on both a pretext theory and a mixed motive theory.[286] Under the *Price Waterhouse* framework, "a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons."[287]  "[A] plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."[288]

---

[284] *Fuentes,* 32 F.3d at 765.

[285] *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).

[286] *Connelly v. Lane Const. Corp.*, 809 F3d. 780, 789 (3d Cir. 2016).

[287] *Makky*, 541 F.3d at 213.

[288] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

She need not produce direct evidence.[289]  If the plaintiff makes the required

showing of sufficient evidence, the burden shifts to the defendant to show "that

even if discrimination was a motivating factor in the adverse employment decision,

it would have made the same employment decision regardless of its discriminatory

animus."[290]

The two frameworks apply different standards of causation.[291]  "[I]n a

'mixed-motive' case, the plaintiff must ultimately prove that her protected status

was a 'motivating' factor, whereas in a non-mixed-motive or 'pretext' case, the

plaintiff must ultimately prove that her status was a 'determinative' factor."[292]

Causation under the mixed-motive framework has been described as "less

exacting" than the causation required to be proved in a pretext case.[293]

In the instant case, Plaintiff conclusionally argues that, for the reasons it

advanced on the *McDonnell Douglas* analysis, even if the evidence she has

presented on summary judgment is insufficient to show that discriminatory animus

was a determinative factor in the employment decision, it is sufficient to show it

was at least a motivating factor.  In opposition, Defendant conclusionally argues

---

[289]  *Id.* at 101-02.  Generally, direct evidence "demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 262, 269 (3d Cir. 1997)(quoted case omitted).

[290]  *Connelly*, 809 F.3d at 787 n.5.

[291]  *Id.* at 787.

[292]  *Id.* at 788.

[293]  *Watson v. Southeastern Pa. Transp. Auth.*, 207 F.3d 207, 215 (3d Cir. 2000).

that, for the reasons it advanced on the *McDonnell Douglas* analysis, Plaintiff has not shown that discriminatory animus was a motivating factor. Defendant further conclusionally argues that it would be able to show that it would have made the same decisions regardless of any discriminatory animus.

For the reasons the Court has given in connection with Plaintiff's failure to establish the fourth element of her *prima facie* case in regard to her failure-to-promote claim and her termination claim, the Plaintiff has simply not met her burden of producing sufficient evidence for a reasonable jury to conclude that race or national origin was a motivating factor in the decision not to promote her and in the decision to terminate her.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge